**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MATTHEW J. WOLF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:13 CV 231 DDN |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Matthew J. Wolf for disability insurance benefits under Title II and for supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. § 401, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 7.) For the reasons set forth below, the decision of the Administrative Law Judge is affirmed.

## I. BACKGROUND

Plaintiff Matthew J. Wolf, born October 7, 1971, applied for Title II and Title XVI benefits on May 19, 2011. (Tr. 117-29.) He alleged an onset date of disability of March 31, 2008, due to learning disabilities (problems spelling), post-traumatic stress disorder, bipolar disorder, attention deficit hyperactivity disorder, irritable bowel syndrome, and residual back pain. (Tr. 152.) Plaintiff's application was denied initially on September 15, 2011, and he requested a hearing before an ALJ. (Tr. 64-68.) On April 24, 2012, following a hearing, the ALJ found plaintiff not disabled. (Tr. 9-19.) On December 7, 2012, the Appeals Council denied

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. The court hereby substitutes Carolyn W. Colvin as defendant in her official capacity. Fed. R. Civ. P. 25(d).

plaintiff's request for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

On February 13, 2008, Brian Edwards, D.O., at Capital Region Medical Clinic-Owensville, evaluated plaintiff. He complained of pain in the back and left hip, frequent anxiety attacks, and depression and reported back surgery two years earlier. He also complained that lifting his leg was difficult. Dr. Edwards diagnosed hip pain, anxiety, and depression, recommended physical therapy, and prescribed Paxil and Xanax.[2] (Tr. 472.)

On March 31, 2008, the day plaintiff alleges he became disabled, he saw Dr. Edwards for continued monitoring of medications related to his depression and anxiety as well as back pain. Dr. Edwards diagnosed back pain, depression, and anxiety, increased Paxil, and instructed him to continue physical therapy. (Tr. 471.)

On May 5, 2008 plaintiff again visited Capital Region Medical Clinic-Owensville for evaluation of his back and hip pain. He reported that his hip pain had nearly subsided but that his back pain remained but had improved. His physical therapist reported an eighty percent improvement with pain, flexion, and strength. Dr. Edwards observed a full range of motion in the hip and back and recommended continued physical therapy. (Tr. 469-70.)

On July 7, 2008, plaintiff went to Capital Region Medical Clinic-Owensville for neck pain and swelling. He reported that a piece of metal hit his neck in February at his place of employment. Dr. Edwards' impression was neck pain and strain. He recommended ultrasound treatment and spine X-rays. (Tr. 468.)

On August 28, 2008, Dr. Edwards diagnosed plaintiff with adult attention deficit hyperactivity disorder and prescribed Adderall. (Tr. 467.)

On August 18, 2009, plaintiff met with Chris Anderson, LPC, LQM, for a therapy session. He stated that he sold his guns . His wife and children had moved away, and plaintiff reported trouble sleeping and eating and anxiety due to not seeing his children. Plaintiff also reported flashbacks and nightmares of his sexual abuse as a child. Mr. Anderson assessed his mood as cooperative, insightful, and receptive with no evidence of mania. He described plaintiff

---

[2] Paxil is used to treat depression and other mental or mood disorders. WebMD, http://www.webmd.com/drugs. Xanax is used to treat anxiety and panic disorder. Id.

as tearful and labile.  He recommended plaintiff undertake an activity to help process the sexual abuse memories, such as journaling, writing, or exercise.  (Tr. 252-53.)

On August 24, 2009, plaintiff saw Mr. Anderson for therapy.  He planned to move to Arkansas near his wife and children in two weeks and to obtain employment.  He sold some of his possessions to pay bills and attended church.  He also reported eating and sleeping better. Mr. Anderson observed bright affect and eurythmic mood and described plaintiff as talkative and receptive.  (Tr. 254-55.)

On September 3, 2009, plaintiff saw Mr. Anderson and reported that he moved half his things to Arkansas.  Plaintiff reported spending time with his children.  Plaintiff had some periods of depression and crying.  Mr. Anderson observed low self-esteem but no depression. He described plaintiff's affect as bright and varied and his insight and judgment as impaired but improving.  (Tr. 256-57.)

On September 14, 2009, plaintiff called Mr. Anderson's office to request an emergency appointment as he drove from Arkansas to Missouri.  Due to difficulties with his spouse, he felt like "he was at the end of his rope" but denied suicidal intent.  He stated that he attempted to obtain employment in Arkansas, tested for employment, and rented an apartment.  Mr. Anderson offered to see him the following morning.  Mr. Anderson also discussed a referral in Arkansas for therapy and medication.  (Tr. 258.)

On September 15, 2009, Mr. Anderson described plaintiff as talkative and receptive but observed that his mood was sad and slightly tearful.  Plaintiff stated that he continued to plan to live and work in Arkansas.  (Tr. 259-60.)

On September 22, 2009, plaintiff called Mr. Anderson's office and stated that he needed to go to a hospital.  He denied suicidal intent.  Mr. Anderson gave plaintiff hospital telephone numbers and offered him an appointment later that day.  Upon plaintiff's arrival, Mr. Anderson observed a depressed mood and flat affect.  Plaintiff indicated suicidal ideation but no plan or intent.  He reported depression, irregular sleep, including nightmares and waking up in a panic, and lack of appetite.  He noted his history of methamphetamine and marijuana use.  He planned on finishing applications for Medicaid and food stamps before going to the hospital.  (Tr. 262-63.)

On September 23, 2009, Mr. Anderson observed depressed mood and flat affect. Plaintiff reported that he completed his Medicaid and food stamp applications. He also discussed paperwork regarding a workers' compensation claim from Chrysler. (Tr. 264-65.)

On September 24, 2009, plaintiff arrived at the St. Mary's Health Center emergency room due to depression and suicidal ideation, including a plan to shoot himself, accompanied by his stepfather. He reported that he worked for Chrysler for thirteen years until March 2008 when he took a buyout during the closing of the factory. His business selling ice cream and barbecue failed. He received a DWI ten years earlier. He graduated high school and attended culinary school but dropped out due to the inability to spell. He had no prior psychiatric hospitalizations. (Tr. 307-08.)

He reported suffering from chronic depression since his teenage years. He reported separating from his wife and children, who moved to Arkansas on August 8, 2009, and that he had been suicidal since then. He reported use of marijuana until August 2009 but only occasional alcohol consumption. He smokes three to four packs of cigarettes per day. Drug screening indicated use of benzodiazepines. He also recounted his sexual abuse as a child. The impression of Dean Breshears, M.D., was depression, posttraumatic stress disorder, history of substance abuse, and strong family history of bipolar disorder. (Tr. 309-12.)

Plaintiff reported very poor sleep, loss of forty pounds in two months, markedly low energy and motivation, problems with memory and concentration, social anxiety, and lack of anger impulse control. He also described his manner of folding clothes, which John W. Clemens, M.D., found indicative of obsessive-compulsive tendencies. He reported that he smoked two packs of cigarettes per day. He stated that he stopped methamphetamine use ten years earlier. Dr. Clemens observed a mild anxiety and a depressed mood with an anxious affect. Dr. Clemens also described his insight and judgment as impaired. Dr. Clemens diagnosed plaintiff with recurrent major depressive disorder with anxiety. He also diagnosed a history of amphetamine dependency in full sustained remission, a remote history of alcohol abuse, and cannabis dependency and assessed a GAF of 35.[3] He prescribed Paxil, Vistaril, trazodone, and Tegretol.[4] On September 30, 2009, plaintiff was discharged. (Tr. 300, 313-16.)

_____

[3] A GAF score helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components.

On October 5, 2009, plaintiff saw Mr. Anderson, who observed depressed mood and sadness. Plaintiff reported nightmares. He reported that he suspected that his wife began cheating on him one year earlier, which left him depressed. He also stated that his wife forbade him from seeing his children due to his lack of employment and his instability. He also reported that he had applied for social security benefits. (Tr. 266-67.)

On October 8, 2009, Mr. Anderson advised plaintiff that he met the criteria for both depression and posttraumatic stress disorder and possibly for borderline personality disorder. Mr. Anderson described plaintiff's decision-making skills, insight, and judgment as impaired. He reported difficulty sleeping and fatigue. Plaintiff stated he had a trial in December regarding a motor vehicle accident that occurred prior to his marriage and that he might receive a settlement payment. Plaintiff complained of being tired and not sleeping well. He also reported that he continued to seek social security benefits. (Tr. 268-69.)

On October 15, 2009, Mr. Anderson observed an animated affect and smiling from plaintiff but confused and depressed mood. Plaintiff also discussed more plans for the future. Plaintiff reported occasional suicidal ideation and nightmares. He also reported that the previous weekend he drank at a local bar to the point of blacking out. Plaintiff stated he began receiving unemployment benefits and discussed going to school for culinary arts or massage therapy. (Tr. 270-71.)

On October 22, 2009, Thomas J. Spencer, Psy.D., performed a psychological evaluation of plaintiff to assist in the determination of his eligibility for Medicaid. Plaintiff reported receiving medical services through Pathways Community Behavioral Healthcare, Inc. for the previous three months due to depression and anxiety. Plaintiff's current prescriptions included

---

A GAF of 31 through 40 means there is impairment in reality testing or communication (such as speech that is at times illogical, obscure or irrelevant), or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (such as depressed, avoids friends, neglects family, and is unable to work). American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 32-34 (4th ed. 2000) ("<u>DSM</u>").

[4] Vistaril is used for anxiety. WebMD, http://www.webmd.com/drugs. Trazodone is used to treat depression and other mental or mood disorders. <u>Id.</u> Tegretol is used to prevent and control seizures. <u>Id.</u>

Seroquel, Paxil, and Vistaril.[5]  Plaintiff slept better on medication but had no change in mood or anxiety.  Without Seroquel, he cannot sleep, and with Seroquel, he sleeps for only three hours. Plaintiff noted daily thoughts of suicide and that he felt hopeless, helpless, and worthless. Plaintiff reported severe sexual abuse as a child and discovering the body of a father figure after he had shot himself.  He also reported receiving treatment for depression eight years ago. Plaintiff stated that he dwells on his family's absence for most of his days.  He lacks energy and motivation and has poor attention and concentration.  He also reported not brushing his teeth, bathing, or changing clothes for as long as week at a time.  His anxiety causes difficulty breathing and chest pain.  He has difficulties with anger.  On plaintiff's last day at Chrysler, he was escorted away in handcuffs for threatening to hurt supervisors.  Plaintiff had also recently engaged in a twenty-mile vehicular pursuit due to a suspected affair involving his spouse.  (Tr. 246.)

Dr. Spencer noted he was hospitalized three weeks ago at St. Mary's but had no other hospitalizations.  Plaintiff was also given intensive outpatient treatment a couple years ago but was forced to leave because he refused medication.  Plaintiff also had chronic back pain, and reported having back surgery three years ago.  Dr. Spencer noted that plaintiff sustained two head injuries due to a motor vehicle accident.  Plaintiff had a misdemeanor arrest for a DWI ten years earlier and two other misdemeanors for unpaid tickets.  He also had a current pending ticket for disturbing the peace.  He also reported no hobbies or interests and that he did not assist with household chores.  (Tr. 247-48.)

Dr. Spencer's impressions were mood disorder and anxiety disorder, and he assessed a GAF score of 50-55.[6]  He determined that plaintiff had a mental illness, which interfered with his ability to engage in suitable employment but that his prognosis would likely improve with treatment and compliance.  (Tr. 249-50.)

Also on October 22, 2009, Plaintiff went to Pathways and received an assessment.  He received an admitting diagnosis of posttraumatic stress disorder and recurrent major depressive

---

[5]  Seroquel is used to treat certain mental or mood conditions.  WebMD, http://www.webmd.com/drugs.

[6]  On the GAF scale, a score from 51 to 60 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers).  DSM at 32-24.

disorder with melancholia. He reported daily flashbacks, hypervigilance, and paranoia. He also disclosed his back problems. He reported that he would begin a job involving concrete the next day and planned to obtain a second job at a restaurant and a third job at a grocery store. Pathways created a treatment plan, including attending outpatient sessions, and agreed to re-evaluate plaintiff in three months. (Tr. 276-97.)

On November 3, 2009, Dr. Robert Frick evaluated plaintiff. Plaintiff reported a history of depression and that his wife left him three month earlier. He further reported prior use of methamphetamine and marijuana and recent alcohol consumption. Dr. Frisk assessed no immediate risk. Dr. Frick diagnosed plaintiff with major depressive episode and posttraumatic stress disorder and considered borderline probable ADHD. He assessed a GAF score of 40. (Tr. 421-24.)

On November 4, 2009, plaintiff saw Mr. Anderson, who observed in plaintiff a depressed but more animated mood and questionable insight and judgment. Plaintiff apologized for missing several sessions and stated that he had been drinking at a local bar recently but that he had stopped. He reported using a singles website and that his nightmares continued. Mr. Anderson commented that plaintiff seemed compliant with treatment. (Tr. 272-73.)

On November 10, 2009, plaintiff attended a therapy session with Mr. Anderson. He stated that he had been sober since the last session but that he had been to the bar at least once to provide transportation for relatives. He planned to move into his house. He reported attending church. Plaintiff requested information about Alcoholics Anonymous meetings, and Mr. Anderson gave him a directory. (Tr. 274-75.)

On November 24, 2009, plaintiff saw Mr. Anderson for a therapy session. Although his mood appeared down, he was smiling and talkative. Plaintiff expressed sadness at not being able to see his children. He also stated he had been sleeping better but that his appetite varied. He had not been drinking alcohol. (Tr. 393-94.)

On November 30, 2009, plaintiff saw Mr. Anderson for a therapy session. Mr. Anderson noted plaintiff's mood suggested self-defeating thinking but no depression. Plaintiff was cooperative but fidgeted. (Tr. 391-92.)

On December 1, 2009, plaintiff saw Dr. Frick.  Dr. Frick noted plaintiff seemed motivated and tried to keep balanced.  He prescribed Paxil, Seroquel, and Wellbutrin SR.[7]  (Tr. 425.)

On December 8, 2009, plaintiff saw Mr. Anderson for a therapy session.  He appeared unkempt and slightly depressed, although he smiled at appropriate times.  Mr. Anderson noted plaintiff's insight and judgment were impaired.  He had moved back into his house.  He also reported nightmares and suicidal ideation but no attempts.  Mr. Anderson suspected borderline personality disorder.  (Tr. 389-90.)

On December 16, 2009, plaintiff saw Mr. Anderson for a therapy session.  His mood appeared depressed, but his affect was varied and not flat.  Mr. Anderson described plaintiff's insight and judgment as poor.  (Tr. 387-88.)

On December 23, 2009, plaintiff visited Mr. Anderson for a therapy session.  Mr. Anderson observed depressed mood and very limited insight and judgment.  He reported depression and suicidal ideation over the previous weekend.  Plaintiff admitted to drinking more heavily.  Mr. Anderson found plaintiff's behavior indicative of borderline personality disorder. He also warned of the danger of consuming alcohol on his medication.  (Tr. 385-86.)

On January 4, 2010, plaintiff again visited Mr. Anderson and discussed the suicidal ideation he experienced on Christmas Day, though he had no suicidal ideation at the time of his appointment.  Plaintiff also discussed returning to school.  Mr. Anderson encouraged plaintiff to increase his activity level to avoid dwelling on his family situation and to stay with family members rather than in isolation.  (Tr. 383-84.)

On January 5, 2010, plaintiff attended an appointment with Dr. Frick.  Plaintiff stated that he struggled through the holidays but that his sleep was better.  Dr. Frick noted plaintiff's ADHD did not improve.  Dr. Frick continued plaintiff on his Paxil and Seroquel medications but discontinued Wellbutrin.  (Tr. 426.)

On January 12, 2010, plaintiff met with Mr. Anderson for a therapy session.  Mr. Anderson described plaintiff's mood as depressed and indecisive and his insight and judgment as impaired.  He reported going to the bar on Friday and Saturday nights.  He also discussed attending AA meetings and returning to school.  (Tr. 381-82.)

---

[7] Wellbutrin is used for smoking cessation and to treat depression and other mental or mood disorder.  WebMD, http://www.webmd.com/drugs.

On January 18, 2010, plaintiff arrived at the emergency room and reported a suicide attempt by overdose during the weekend and that he had attempted to hang himself on Christmas Day. He reported increased depression due to separation from his wife and drinking large quantities of tequila. Although he denied drug abuse, drug screening indicated use of benzodiazepines and tetrahydrocannabinol (THC). The impression of Vickie J. Park, M.D., was depression with suicidal ideation. Because St. Mary's Health Center facility had no available beds, Dr. Park recommended Audrain Medical Center. (Tr. 317-28.)

On January 19, 2010, plaintiff met with Mr. Anderson and discussed his hospital visit and his decision not to go to the Audrain Medical Center. Mr. Anderson observed that plaintiff appeared less depressed and expressed more hope and direction than during prior sessions. He also discussed returning to church and attending AA meetings. Mr. Anderson encouraged him to pursue these activities and emphasized the need to surround himself with positive people and not to dwell on his mistakes. Plaintiff also suggested that he was overmedicated, and Mr. Anderson encouraged him to speak with a medical professional. (Tr. 379-80.)

On January 26, 2010, plaintiff stated that he did not attend any Alcoholics Anonymous meetings because he did not want to cry in front of other people. He reported frequent crying spells. Mr. Anderson encouraged him to attend the meetings. Plaintiff also reported that he stopped taking his medication because he did not believe that they improved his condition but agreed to speak with Dr. Frick the following week. (Tr. 377-78.)

On February 2, 2010, plaintiff saw Dr. Frick and reported that he overdosed on alcohol and stopped taking his medication. He also told Dr. Frick that he preferred no medication and that he stopped drinking. Dr. Frick noted plaintiff's pattern of absolutist thought. (Tr. 427.)

On February 3, 2010, plaintiff met with Mr. Anderson and told him that he had attended an Alcoholics Anonymous meeting and that he believed the meetings helped him. He also informed him that he attended church and that his wife had a boyfriend. Mr. Anderson observed that plaintiff appeared less depressed and described him as more goal-oriented but self-deprecating. (Tr. 375-76.)

On February 10, 2010, plaintiff reported that he had been to four Alcoholics Anonymous meetings during the previous week, attended church, and planned on going back to school. He also reported going to a bar for the Super Bowl but that he did not drink. Mr. Anderson

encouraged plaintiff to structure his life further and journal. He also observed that plaintiff did not appear depressed but appeared pleasant, coherent, and talkative. (Tr. 373-74.)

On February 16, 2010, plaintiff reported attending more Alcoholics Anonymous meetings but that he continued to visit the local bar without drinking. He also stated his intent to apply for a land caretaker position that would begin at the end of the year. Mr. Anderson opined that plaintiff's pattern of alternating between no activity and overscheduling suggested borderline personality trait. He observed that plaintiff did not appear depressed but appeared normal, talkative, and goal directed. He also noted that plaintiff had impaired judgment and insight. (Tr. 371-72.)

On February 24, 2010, plaintiff reported that he had received divorce papers and that he argued with his wife. He also reported anger and that he punched six holes in a wall during the previous week. He threatened to leave the session due to Mr. Anderson's attempts to obtain further details. He also told Mr. Anderson that he would not attend further Alcoholics Anonymous meetings, denied alcoholism, and referred to other attendees as hypocrites. Plaintiff discussed applying for a job in Jefferson City and becoming a minister. Mr. Anderson observed a labile mood, varied affect, and impaired judgment and insight. (Tr. 369-70.)

On March 3, 2010, plaintiff discussed applying for a job in Jefferson City and selling his house. He reported visiting his wife and daughters but that he "fell apart" at the end, which angered his wife. Mr. Anderson told him to prioritize his decisions and to take them one at a time. (Tr. 367-68.)

On May 20, 2010, plaintiff attended a meeting at Pathways and discussed his desire to remain off medication. He was prescribed clonazepam.[8] (Tr. 428-29.)

On July 15, 2010, plaintiff went to Pathways for an appointment. He was prescribed clonazepam and Paxil. (Tr. 430.)

On August 11, 2010, plaintiff arrived at the emergency room at Phelps County Regional Medical Center due to suicidal thoughts and depression. Drug screening indicated use of cannabinoids. (Tr. 342-346.)

Plaintiff then transferred to Cox Medical Center and Mehret Gebretsadik, M.D., evaluated him. Plaintiff reported a methamphetamine use relapse and suicidal ideation resulting

---

[8]    Clonazepam is used to treat seizures and panic attacks. WebMD, http://www.webmd.com/drugs.

from an argument. He also reported binge drinking and the occasional use of marijuana. Dr. Gebretsadik assessed adjustment disorder with depressed mood or substance-induced mood disorder and polysubstance dependence and advised him to continue on Paxil. He recommended AA meetings and substance abuse treatment and assessed a GAF score of 60. (Tr. 330-31.)

Jonathan Thornsberry, M.D., also evaluated plaintiff. He assessed chronic back pain and elevated blood pressure and found plaintiff medically stable. He recommended Tylenol for the back pain and no further back pain evaluation absent new symptoms or a sudden increase in severity. He opined that anxiety and drug use caused the elevated blood pressure and recommended that plaintiff monitor his blood pressure. (Tr. 332-33.)

On August 19, 2010, plaintiff went to Pathways for an appointment and reported not taking any medication. Plaintiff was prescribed Paxil and clonazepam. (Tr. 432-33.)

On August 31, 2010, plaintiff arrived at the emergency room at Phelps County Regional Medical Center regarding injury to his face and mouth received at the local bar. Plaintiff reported he knew his attackers and that they struck with fists and a beer bottle. Plaintiff had injuries to his left eye and a laceration on his inner lip. X-rays of his nose revealed no evidence of a fracture. A head CT scan revealed some left supraorbital soft tissue swelling and an old nasal fracture. (Tr. 338-41.)

On September 16, 2010, plaintiff went to Pathways for another appointment. He reported doing better and discussed his bar fight. Plaintiff also reported continuing to receive unemployment benefits and denied any hopelessness or helplessness. He stated that his medication has been helping him, and he was continued on Paxil and clonazepam. (Tr. 434-35.)

On November 30, 2010, plaintiff attended a therapy session with Diana Shoupe, LPC. Though his mood was low, his affect was within normal limits. Plaintiff stated that he no longer saw Dr. Frick due to failure to comply and that he missed an appointment with Dr. Gowda. He stated that his unemployment benefits would run out in a few days. Ms. Shoupe discussed the importance of plaintiff staying on his prescription medication, participating in his therapy program, and meeting his therapy goals. She opined that plaintiff had an inflated sense of self-importance and borderline traits and lacked motivation and good judgment. (Tr. 352-53.)

On December 7, 2010, Diana Shoupe saw plaintiff for therapy. Ms. Shoupe reported behavior counterproductive to therapy and refusal to take his medication. Plaintiff was argumentative, accusatory, and stated that he would only do things his way. Plaintiff also

remarked that he would not "take just any job even though [his] unemployment runs out this week," and expressed entitlement to more unemployment because he "paid in a lot of money" at his previous position with Chrysler. Plaintiff left the session without rescheduling, Ms. Shoupe discharged him from therapy. (Tr. 350-51.)

On February 3, 2011, Pathways Community Behavioral Healthcare, Inc. discharged plaintiff from the treatment program. Plaintiff failed to meet any of the objectives on his treatment plan, refused to respond to communications from Pathways, refused to take the medication prescribed by his psychiatrist, and continued to drink alcohol and involve himself in fights at a local bar in town. The discharge summary indicated that plaintiff's functional limitations included adapting to change, behavioral adjustments to change, coping emotionally with change, correspondence, paperwork, and appointments, decision-making, friendships, financial management, maintaining residence, relating to law enforcement officers, and relating to strangers. It further indicated diagnoses of recurrent major depressive disorder, alcohol dependence, posttraumatic stress disorder, and borderline personality disorder and assessed a GAF of 45. (Tr. 354-66.)

On June 5, 2011, Dr. Thomas Spencer conducted a psychological evaluation of plaintiff for Medicaid eligibility. Plaintiff reported his history of depression, his prior back surgery, and a history of automobile accidents. Plaintiff also reported the following. He received counseling until November 2010 and left because his counselor focused on his drinking. He met with a psychiatrist but stopped due to his prescription overdose. He stopped taking medication and attended AA meetings regularly. He has not been intoxicated for six or seven months. He turned to alcohol after his wife left him. He experienced sexual abuse by five individuals, including his brother. He lost his job with Chrysler after the plant closed. He attempted to obtain a degree and also run an ice cream truck business but failed. His mood is depressed, and he is socially isolated. He has recurrent suicidal thoughts and attempted a hanging on Christmas day in 2009. He has difficulty falling and staying asleep. He feels hopeless and helpless and has low self-esteem. He has an explosive temper that results in punching and breaking objects and occasional fights. He spends his days lying in bed but does not watch television.

Dr. Spencer observed depressed mood, restricted affect, and questionable insight and judgment. His impressions were mood disorder, methamphetamine dependence in early remission, and alcohol abuse and assessed a GAF score of 50-55. Dr. Spencer concluded that

plaintiff's mental condition interfered with his ability to engage in suitable employment but that with continued sobriety, appropriate treatment, and compliance, plaintiff's prognosis would likely improve. (Tr. 437-441.)

On August 22, 2011, plaintiff saw Bobby Enkvetchakul, M.D., for a medical evaluation regarding his social security disability claim. In his medical history, plaintiff reported having back problems in high school and attributed his back condition primarily to his involvement in fifteen car accidents. He underwent a microdiscectomy in 2006. Plaintiff received some physical therapy in 2007 and 2008 but found that the relief was temporary. Plaintiff also attributed the pain in his left shoulder to motor vehicle accidents. He received some physical therapy and cortisone shots, but the last time that shoulder was evaluated was in 2008. (Tr. 451-53.)

Plaintiff complained of pain in his lower back and left shoulder. He stated that occasionally, the pain would radiate to his front hip or that his feet numbed. Plaintiff also reported that he suffered depression for approximately five years. Plaintiff stated he was recently hospitalized due to suicidal ideation but denied any immediate intent. He also reported a prior history of irritable bowel syndrome. Plaintiff's medications included Paxil, Seroquel, Vistaril, and trazodone. Plaintiff also stated that he divorced about one year earlier, lived alone in a one-story house, and drank alcohol on a regular basis. He also reported smoking one pack of cigarettes per day and that he smoked intermittently for the last 20 years. He stated he had a high school education as well as one year in college but no degree. (Id.)

Plaintiff reported being unemployed and that he last worked in May 2008 at the Chrysler plant where he had been employed for 14 years. He also worked at a pool table factory for one year, construction for three years, a gas station and garage for one year, and an automotive store for about one year. Plaintiff also reported that he was not attempting to obtain employment because he did not feel stable enough to maintain employment due to his psychiatric issues. (Id.)

For his physical examination, plaintiff presented with no obvious deformity and no active distress. He could get on and off the exam table without assistance and could stand from a seated position on his own. His affect was flat and eye contact poor during the interview. However, plaintiff ambulated with a normal stride and without any evidence of a limp. Plaintiff's active range of motion of the lumbar spine was full. Plaintiff could bend forward at the waist and sides and get his hands down to the level of his ankles. Although he was tender to

palpation over the left posterior/superior iliac spine region, there were no muscle spasms and plaintiff's strength was a normal 5/5.  An examination of plaintiff's cervical spine revealed plaintiff's neck as supple but with some decreased motion extension and rotation of the left.  Again, there was tenderness to palpation but no muscle spasms.  The active range of motion of plaintiff's left shoulder was full and symmetric to the opposite side.  Strength testing revealed a score of 4/5.  Although his grip strength was noted as weaker on the left side compared to the right, Dr. Enkvetchakul noted plaintiff's effort was somewhat questionable.  (Id.)

Dr. Enkvetchakul diagnosed status post-lumbar surgery with ongoing low back complaints, neck and left shoulder pain, and depression.  Dr. Enkvetchakul noted plaintiff's exam was consistent with a prior history of lumbar surgery, but plaintiff's residual low back complaints seemed to be musculoskeletal in nature without any evidence of more significant pathology.  Similarly, plaintiff's complaints of pain in his neck and left shoulder seemed to be musculoskeletal in nature without any evidence of radiculopathy or other types of diagnoses.  Dr. Enkvetchakul noted that psychiatric or psychological issues were likely to be the overriding factor in plaintiff's presentation.  (Id.)

Dr. Enkvetchakul determined that he could not find any objective physical evidence for any type of significant physical activity restrictions.  Based on his prior history of lumbar surgery, Dr. Enkvetchakul set a 50-pound lifting limit but could find no definite evidence for any restrictions in standing, walking, or carrying.  There were also no problems with speaking, hearing, reaching, or handling objects.  Because of plaintiff's current medications, Dr. Enkvetchakul recommended that plaintiff avoid any hazardous work while taking medications that might impair his motor skills or judgment.  (Id.)

On August 24, 2011, plaintiff saw Dr. Keith at the Medical Clinic of Owensville.  He complained of neck and back problems, stress, and irritable bowel syndrome.  Dr. Keith diagnosed irritable bowel syndrome, degenerative joint disease, and history of alcohol abuse.  (Tr. 478.)

On September 12, 2011, Julia Redding submitted a Physical Residual Functioning Capacity Assessment regarding plaintiff.  She found plaintiff able to lift and carry 50 pound or less occasionally and could carry 25 pounds or less frequently.  He could stand or walk with normal breaks for six hours of an eight-hour workday and could sit for six hours of an eight-hour

workday. She further found that plaintiff should avoid all exposure to hazards, including machinery and heights. (Tr. 52-57.)

On September 12, 2011, Margaret Sullivan submitted a Psychiatric Review Technique. She found that plaintiff suffered from ADHD, mood disorder, posttraumatic stress disorder, borderline traits, methamphetamine dependence in early remission, and alcohol abuse. She further found that he suffered mild restrictions in daily living activities, moderate difficulties in social functioning and had one or two episodes of decompensation each of extended duration. (Tr. 454-65.)

On the same day, September 12, 2011, Margaret Sullivan submitted a Mental Residual Functioning Capacity Assessment regarding plaintiff. She determined plaintiff to be moderately limited in his ability to understand, remember, and carry out detailed instructions. She also determined plaintiff to be moderately limited in his ability to concentrate for long periods of time, to work in coordination or proximity with others without being distracted, to maintain socially appropriate behavior, interact well with coworkers and the general public, to accept criticism and instruction from supervisors, and to maintain basic standards of neatness and cleanliness. (Tr. 58-60.)

On September 13, 2011, plaintiff saw Dr. Keith at the Medical Clinic of Owensville for a follow up visit concerning his cholesterol blood work. Dr. Keith discussed the results of plaintiff's blood work and doubted that plaintiff would put sufficient effort into controlling his cholesterol by diet or exercise. Plaintiff still complained of pain in his left shoulder and neck. A strength test revealed 5/5 in plaintiff's right arm and 4/5 in plaintiff's left arm. Dr. Keith prescribed Vimovo for plaintiff's neck pain and Tramadol for plaintiff's arm pain. (Tr. 477.)

On September 19, 2011, plaintiff went to the Medical Clinic of Owensville and saw therapist Brandylyn Bristow, LCSW, for an initial assessment of his depression. Plaintiff reported symptoms of panic and anxiety while driving due to multiple car accidents. He also complained of past suicidal thoughts and symptoms of posttraumatic stress disorder due to sexual abuse as a child. Plaintiff stated that he had symptoms of paranoia and had difficulty sleeping. He occasionally hears voices. He reported that he had been hospitalized four times during the past two years for suicidal ideation and depression. Plaintiff stated that he continued taking Paxil, Seroquel, Vistaril, and Trazodone after his August 2011 hospitalization. He spent the year and a half prior to August 2011 without medication. Plaintiff reported rare use of

alcohol throughout August 2011 but admitted to occasional marijuana use.  Plaintiff stated that he had not been able to work for the past four years due to mental issues.  Plaintiff also was undergoing bankruptcy and foreclosure on his home and owed $12,000 in taxes.  Plaintiff reported receiving Medicaid and food stamps.  Ms. Bristow diagnosed plaintiff with severe recurrent major depression with psychotic features, posttraumatic stress disorder, and irritable bowel syndrome.  She assessed a GAF score of 40.  (Tr. 224-27.)

On September 30, 2011, plaintiff received a MRI of his cervical spine at the Hermann Area District Hospital, conducted by Dr. James Wasielewski.  The MRI showed no acute fracture but some mild to moderate discogenic disease at C5-C6 and some minimal bony foraminal narrowing on the right at C5-C6.[9]  (Tr. 487-90.)

On October 10, 2011, plaintiff saw Ms. Bristow at the Medical Clinic of Owensville to create an initial one-year treatment plan, which included reducing the amount of anxious and depressed feelings, dealing with the previous trauma that caused him to have PTSD symptoms, and becoming healthy and strong enough to move to Arkansas to be near his children.  Plaintiff agreed to be medication compliant and to attend regular therapy sessions to assist him.  (Tr. 222-23.)

On October 12, 2011, plaintiff saw Dr. Keith at the Medical Clinic of Owensville to discuss his X-rays and refill his medications.  Plaintiff complained of pain in his left arm.  Dr. Keith continued him on all his medications and recommended an MRI of plaintiff's neck.  (Tr. 476.)

On October 18, 2011, plaintiff received an MRI of his cervical spine due to left-sided neck pain radiating into the arm.  Dr. Keith found mild cervical spondylosis, mild facet arthropathy, mild degenerative disc disease, mildly small pituitary gland, and multilevel foraminal narrowing, particularly with the left C5-C6.  (Tr. 481-83.)

---

[9] The human spinal column consists of thirty-three vertebrae.  There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx).  The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back.  The sacrum is immediately below the lumbar vertebrae.  Stedman's Medical Dictionary, 2117-18 (28th ed., Lippincott Williams & Wilkins 2006).

On October 25, 2011, plaintiff met with Dr. Keith at the Medical Clinic of Owensville to discuss the results of his MRI regarding his left-sided neck and arm pain. Dr. Keith prescribed plaintiff lovastatin and Ultram for the pain.[10] (Tr. 475.)

On December 13, 2011, Ms. Bristow completed a mental medical source statement. She found plaintiff moderately limited with understanding, remembering, and performing both simple and detailed instructions, extremely limited in maintaining attention and concentration, performing activities within a schedule, including regular attendance and punctuality, working in coordination or in proximity with others, and the ability to complete a normal work schedule without unreasonable interruptions. She also found him markedly limited with the ability to sustain an ordinary routine without supervision and moderately limited with the ability to make simple decisions. She further found him extremely limited with appropriate interactions with the general public or coworkers and markedly limited in the ability to ask simple questions or to respond appropriately to supervisors. She also found him moderately limited in the ability to respond appropriately to work changes, to notice and take precautions for safety hazards, and the ability to set realistic goals or independently plan. She found him extremely limited in the ability to travel to unfamiliar places or use public transportation. Ms. Bristow based her assessment on clinical findings, diagnoses, and treatment. (Tr. 213-14.)

On January 9, 2012, plaintiff attended a therapy session with Ms. Bristow at the Medical Clinic of Owensville. Plaintiff reported frustration with social situations and struggling with Christmas. Ms. Bristow noted an increase in eye contact and fairly good mood. He also reported that he burned part of his field, and that the people who came by to check on the fire frustrated him because he had the fire under control. He reported working around the house and cleaning his garage. Plaintiff stated that he upset his friend, a blacksmith, by refusing to help him due to the pain that lifting caused him. He had several ideas, including fish farming or a candy business. He also planned on finding ways to pay for property taxes and fines regarding his driver's license. (Tr. 219-21.)

On January 16, 2012, plaintiff again saw Ms. Bristow for therapy. (Tr. 217-18).

On January 17, 2012, plaintiff saw Dr. Keith at the Medical Clinic of Owensville. Plaintiff complained that the Ultram did not control the pain in his back and neck. Dr. Keith

---

[10] Lovastatin is used to lower bad cholesterol and fats and to raise good cholesterol in the blood. WebMD, http://www.webmd.com/drugs.

prescribed Vicodin and Naproxen for his neck and lower back pain and Bentyl for irritable bowel syndrome. Dr. Keith noted that plaintiff did not attend a referral as ordered. (Tr. 496.)

On January 24, 2012, plaintiff saw Ms. Bristow for a therapy session. Plaintiff stated that he was stressed due to recently missing a court date for his traffic tickets; he did not know of it at the time, and a warrant was out for his arrest. However, he indicated that he had hired a lawyer. Plaintiff discussed starting a candy business for Valentine's Day and selling his inventions. He also reported that he cleaned the outside of his house. Ms. Bristow noted his struggles with mood control but that plaintiff seemed more stable. Plaintiff made eye contact and talked about his hopes for the future. (Tr. 215-16.)

On January 31, 2012, plaintiff saw Ms. Bristow for a therapy session. She observed plaintiff as alert, responsive, and talkative but noted some difficulty with eye contact. Plaintiff stated he had a difficult week and wanted to become a hermit. Plaintiff reported that a police officer arrested him for a lack of current license plates and for failure to obey police officers. The police also impounded his van. (Tr. 238-39.)

On February 1, 2012, plaintiff reported to the Medical Clinic of Owensville to refill his prescriptions. Plaintiff complained of low back and hip pain. (Tr. 495.)

On February 3, 2012, Ms. Bristow filled out a medical source statement regarding plaintiff. She noted that plaintiff suffered from severe episodes of depression and posttraumatic stress disorder, which significantly decreased his daily functioning ability. She stated that plaintiff tends to isolate himself with a weak support system. She noted marked difficulty in daily living and extreme difficulty in social functioning. She also noted deficiencies with concentration, persistence, and pace and repeated episodes of decompensation. Ms. Bristow found that plaintiff made no significant improvement after at least fifteen sessions. She assessed a GAF of 53. She also noted that plaintiff suffered anhedonia, sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating, suicidal thoughts, and paranoia. (Tr. 231-33; 243-44.)

On February 10, 2012, plaintiff attended a therapy session with Ms. Bristow. Plaintiff reported having difficulties with his family and friends but appeared calmer and more relaxed and smiled. Plaintiff stated he was withdrawing from his family by choice. He reported that he fixed his aunt's broken car and painted but that she refused to pay him. (Tr. 236-37.)

On February 20, 2012, plaintiff met with Ms. Bristow for a therapy session. Plaintiff reported continued withdrawal from his family and that he felt hopeless. (Tr. 234-35.)

**Testimony at the Hearing**

The ALJ conducted a hearing on March 8, 2012. (Tr. 24-49). Plaintiff testified to the following. Plaintiff lives alone in a house and has a high school education and some vocational training in culinary arts and automobile mechanics. He briefly owned and operated an ice cream business. Plaintiff has received unemployment benefits multiple times during and after his employment with Chrysler. During unemployment, plaintiff applied for work in a local restaurant and factories. He has been in jail three times for traffic violations and received a DWI in 1999. (Tr. 27-31.)

Plaintiff has taken medication intermittently for his mental condition for six years and has been taking his medication since August 2011. He does not see a psychiatrist or a psychologist. (Tr. 33.)

At home, plaintiff performs household chores, including laundry, dishes, and cleaning the floor. He regularly procrastinates, and washing the dishes can take up to six hours due to the amount of dirty dishes. On a typical day, plaintiff awakens, takes his medication, eats at 2:00 p.m., and visits his doctor, if scheduled. Plaintiff makes meals by microwave. He can cook more complex meals but has lost the desire. He also has an eight-acre yard that he neglected in 2011 by failing to mow. Plaintiff has a Missouri driver's license and can drive, although it causes major anxiety. He has been in 15 automobile wrecks. He has not been social since his ex-spouse left him. He has socially isolated himself since childhood. He has an interest in renewable energy. (Tr. 34-36.)

He watches PBS but has occasional difficulty staying interested in a program. Depression has been the main obstacle impeding his return to work. He feels as though he does not belong in society. Some days leaving his bed is difficult, and he has accidents in his bed. Unemployment and his children exacerbate his depression. He has been admitted to the hospital four times for his mental condition, typically due to suicidal thoughts. Suicidal thoughts plague him constantly. His suicidal thoughts stem from finding the man he believed to be his father immediately after the man committed suicide. He experiences mood swings. (Tr. 37-38.)

Plaintiff attended vocational rehabilitation in Arkansas and took a two-day test. (Tr. 39.)

Plaintiff left his employment at Chrysler due to closure. Plaintiff had difficulty performing his job due to his mental and physical condition. On his last day, plaintiff and his supervisor were involved in a physical altercation that resulted in security personnel handcuffing plaintiff and told him to leave. The physical altercation arose because his supervisor attempted to force plaintiff to work for two more weeks. People instructing him regarding his life causes anger. Completing household chores, including dishes or laundry, can take days. (Tr. 40-41.)

Plaintiff smoked marijuana the previous weekend. Marijuana helps him through extremely depressed, suicidal states. (Tr. 42).

Vocational Expert (VE) Tracy Young also testified at the hearing. The ALJ asked whether plaintiff could perform past relevant work and indicated that plaintiff was limited to unskilled, light exertional work, and that he should avoid ropes, ladders, scaffolding, and hazardous heights. The VE responded that plaintiff could not perform past relevant work, which included positions as a meat carver and automobile assembler. The ALJ presented a hypothetical individual with the educational, vocational, and residual capacities of plaintiff. The VE responded that such individual could perform as a fast food worker, which is light, unskilled work with 2,061,395 positions nationally, and 62,220 positions in Missouri; a cashier, which is light, unskilled work with 1,712,170 positions nationally, and 37,580 positions in Missouri; and a housekeeping cleaner, which is light, unskilled work with 221,060 positions nationally and 5,058 positions in Missouri. (Tr. 42-45.)

The VE also responded to an inquiry propounded by plaintiff's counsel. Plaintiff's counsel asked if the job bases would remain for an individual who would be off-task for an average of 20 percent of the day. The VE responded that they would not. The VE elaborated that fast food requires high productivity measured by customer satisfaction, that cashiering requires lower productivity measured by customer satisfaction, and that the productivity required for housekeeping varied. (Tr. 46-47.)

### III. DECISION OF THE ALJ

On April 24, 2012, the ALJ issued a decision that plaintiff was not disabled. (Tr. 9-19.) At Step One of the prescribed regulatory decision-making scheme,[11] the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date, March 31, 2008. At

---

[11] See below for explanation.

Step Two, the ALJ found that plaintiff's severe impairments were degenerative disc disease and foraminal narrowing of the cervical spine, ADHD, post-traumatic stress disorder, and bipolar disorder. (Tr. 11.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments. (Tr. 11.)

The ALJ considered the record and found that plaintiff had the residual functional capacity (RFC) to lift and carry 20 pounds occasionally and 10 pounds frequently, stand or walk six hours out of an eight-hour work day, and sit six hours of an eight-hour work day. The ALJ further found that plaintiff must avoid climbing ropes, ladders, scaffolds, and hazardous heights. In addition, the ALJ found that plaintiff was able to understand, remember, and carry out at least simple instructions and non-detailed tasks. At Step Four, the ALJ found plaintiff unable to perform any past relevant work. At Step Five, the ALJ found plaintiff capable of performing jobs existing in significant numbers in the national economy. (Tr. 13-18.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled.

20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment.  20 C.F.R. § 404.1520(a)(4)(i)-(iii).   If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW).  Id. § 404.1520(a)(4)(iv).  The claimant bears the burden of demonstrating he is no longer able to return to his PRW.  Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy.  Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V.  DISCUSSION

Plaintiff argues that the ALJ erred in determining plaintiff's RFC because (1) the ALJ did not base plaintiff's physical RFC on substantial evidence within the record by failing to provide a specific bridge between the physical RFC and medical evidence, (2) and that the ALJ did not review the medical evidence as a whole with regard to plaintiff's mental RFC.

## A.  Physical Residual Functional Capacity

Plaintiff argues that the ALJ erred in determining plaintiff's RFC because the ALJ did not base his determination of the RFC on substantial evidence within the record.  Specifically, plaintiff argues that the ALJ erred by not providing a specific bridge between plaintiff's physical RFC and the medical evidence.

Plaintiff relies on Social Security Ruling 96-8p, which states that the ALJ must consider all allegations of physical and mental limitations and must make every reasonable effort to ensure that the record contains sufficient evidence to assess the RFC.  Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8p (1996).  This ruling also states that the RFC assessment must contain a narrative discussion of evidence supporting each conclusion with citations to specific medical facts and nonmedical evidence.  Id.  Plaintiff argues that the ALJ did not link the physical RFC determination with any medical evidence.

The ALJ based his decision on substantial evidence and provided a narrative discussion regarding such evidence. Specifically, regarding plaintiff's allegations of physical impairments, the ALJ referenced Dr. Edwards's assessment of plaintiff's physical condition near the time of the alleged onset date. (Tr. 14, 469-70.) The ALJ also referenced a cervical x-ray from September 30, 2011 and an MRI of the cervical spine from October 18, 2011, which only showed moderate discogenic disease, minimal bony foraminal narrowing, mild cervical spondylosis, minimal-to-mild facet arthropathy, and mild degenerative disc disease. (Tr. 14, 481-83, 487-90.) The ALJ also noted that plaintiff alleged an onset date of 2008 but lacked substantial treatment records for his physical condition until after 2010. (Tr. 14; see Burke v. Astrue, 2011 WL 3903435, *10 (E.D. Mo. 2011). Additionally, the ALJ referenced a consultative examination with Dr. Enkvetchakul, in which Dr. Enkvetchakul determined that he could not find any objective physical evidence for any type of significant physical activity restrictions, merely setting a 50-pound lifting limit and recommending that plaintiff refrain from hazardous work while taking medications that might impair his motor skills or judgment. (Tr. 15, 451-53.) He also discussed records indicating that plaintiff failed to follow up on a referral. (Tr. 14, 496); see Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006). Substantial evidence supports the physical RFC determination, and the ALJ's decision concerning physical RFC complies with the requirement for a narrative discussion of the evidentiary support.

Because the ALJ complied with SSR 96-8p by supporting the physical RFC determination with substantial evidence and provided a narrative discussion of the evidence in support, plaintiff's argument is without merit.

## B. Mental Residual Functional Capacity

Plaintiff argues the ALJ erred in deciding plaintiff's RFC by not considering the medical evidence as a whole in regards to plaintiff's mental impairments. The ALJ must always consider medical source opinions and must consider all the evidence within the record when determining the RFC. Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8p (1996).

Plaintiff specifically alleges that the ALJ did not consider the opinions of Dr. Spencer and Dr. Enkvetchakul, diagnoses of depression, anxiety, and mood disorder, Mr. Anderson's therapy session notes, and plaintiff's hospitalizations for his mental condition. However, the

ALJ expressly discussed the aforementioned opinions, diagnoses, therapy sessions, and hospitalizations in the discussion of the mental RFC. (Tr. 15-17.)

The ALJ considered the evidence in the record for the mental RFC determination. Accordingly, plaintiff's argument is without merit.


## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.


_____/S/   David D. Noce_____

**UNITED STATES MAGISTRATE JUDGE**



Signed on March 24, 2014.